And we will hear from counsel on Sesay v. Napolitano. May it please the Court, James Fife of Federal Defenders, on behalf of the appellant, Mr. Sesay. I'd like to reserve two minutes of my time for rebuttal. Thank you. Your Honors, the record in this case is 500 pages long. But the only evidence in this 500 pages supporting the government's position is a single sentence by Officer Thomas. A sentence which is contradicted by four sworn declarations by three ICE officers directly involved in the removal effort, contradicted by a year's worth of computerized phone records, contradicted by two official notifications formally served on Mr. Sesay, and contradicted by three custody reports, two of which were authored by Officer Thomas himself. The district court erroneously denied the petition on the basis of that single sentence. Well, what is the single sentence? I read more than one sentence there. This is the sentence which the government and the district court relied on over and over for the basis of the claim of obstruction. That's the sentence that appears on page 481 of the record. This was in the December 2007 custody review by Officer Thomas, in which he said, since then, that is, since the previous custody review in August, since then Sesay keeps providing ICE and Sierra Leone Consulate with conflicting information regarding his true nationality. Following Sesay's review, the Sierra Leone Consulate notified ICE that a travel document could not be issued due to him claiming to be a Sudanese citizen. There is nothing in the record except that one sentence, which indicates that Sudan, that Sierra Leone, excuse me, number one, refused to issue travel documents, or number two, that that was because if there was a refusal, that it was because of his claim of Sudanese nationality. Is there any evidence that there was a refusal? No. In fact, the evidence is to the contrary. As I said, four sworn statements by three ICE officers say the opposite. That's Officer Pitt's declaration, Officer Pitt's sworn answers to interrogatories, Officer Padilla's declaration, and a declaration which the government submitted in opposition to the motion for bail on appeal by Officer Coronado. Every one of those say that Sierra Leone is still considering it, and as Officer Pitt said, they have given us no timeline and given us no reason for why they have not answered our request. Two requests, two formal requests that ICE made. Now, is the failure to cooperate, let's set aside for a second whether the government was permitted to extend the removal period by its notice of cooperation, which seems to be untimely. Yes. Is the alleged non-cooperation solely his saying that he is, I guess, a native citizen of Sudan? Correct, Your Honor. That's the only basis for the claim of obstruction. In fact, Officer Pitt, in his interrogatory answers, specifically says that Mr. Sesay has fully complied with everything that ICE has asked him to do. He has provided all documents that he has available, he has filled out all forms, and he has conducted any telephone interviews which they have asked him to do. I have a question. This is sort of just how this works exactly because, you know, sometimes we get all of this. But it strikes me a little bit like, all right, when someone says they're not guilty and then they're convicted, all right, and then when you sentence them, you can't punish them for lack of remorse because they say they're not guilty. You know, they still can maintain their innocence. So let's say, you know, so that the reason that he is not cooperative is I am Sudanese. Right. And they think he's Sierra Leone. Correct. Can someone just avoid the whole process or is there a mechanism that a court can then hold an evidentiary hearing? Because he is removable. We know that. Yes. He's removable. No doubt about that. Yes. And so the question is, and I think they previously said he should go to Sierra Leone. And it's not clear to me, as you've said from the record, whether Sierra Leone really won't take him or what that situation is. But let's just assume that, you know, I'm Sudanese. All right. But the court and everyone, I mean, that after a hearing the court makes a determination, no, you're not, you know, everything before me says you're from Sierra Leone, is can a person, can Sierra Leone still say I'm not taking anyone or can they say, well, I'm not going to take anyone unless they say they're from Sierra Leone? I mean, it doesn't seem right that the process could just be halted by someone saying I'm such and such and that there wouldn't be some mechanism to determine it. Now, maybe you can't prove it. And then if you can't prove it, then that's a whole other thing. Right. I guess I'm agreeing with you a little on the fact that he wants to claim he's from Sudan. Yes. He can claim that, you know, he can whistle that and sing a song and claim that for the rest of his life. But can people, but let's say, but can people, I guess because Sudan, we're not going to return people to Sudan probably. So that could catch on as just say you're from Sudan and then you can't go anywhere. It doesn't seem that the courts would have no arrows in their quiver on this point. But I don't know whether it can be, you could say it was a lack of cooperation until there was an evidentiary hearing to actually ascertain that this person, you know, I am hearing all the evidence, it's conflicted, but I have made a determination you're from Sierra Leone. Well, that's what the district court here did, and I was strenuously trying to change the focus of the inquiry because my point was that the inquiry shouldn't be on what is Mr. Sesay's true nationality as the government and as the district court believed. The only question relevant to the Pellich obstruction defense is why has the issuance of travel documents been delayed? Is it because of a deliberate bad faith act by Mr. Sesay? And as I pointed out in my briefs, if Mr. Sesay, for instance, claimed he was a Martian or the queen of Romania, but in fact Sierra Leone said we do not take back people who have criminal convictions, then it doesn't matter, it's like looking at a criminal prosecution under 1001, is that if it's not material to the removal process, then it doesn't matter whether in fact he is from Sierra Leone or Sudan. And that's why I tried to steer the district court to narrowing the consideration into simply what is the reason that we do not have travel documents after 30 months, after two and a half years, after five times the Zovitis reasonable period, why has Sierra Leone not said yes or no or maybe or given any indication? I said that is the central inquiry. The nationality may be one of the reasons, but in fact it probably isn't. I mean, the two likeliest answers are, number one, Mr. Sesay has a forged passport, which he bought in Los Angeles in order to obtain a work permit. And so there's one good reason. But I think probably the real reason is that Sierra Leone is like a number of countries, which the inspector general of DHS has identified, and I quoted in the briefs from that report, that there are a number of countries that simply do not want to accept back deportees from this country. Well, in your case it's not particularly attractive from the standpoint of like, oh, yeah, it's not like, okay, as a Ph.D. in nuclear, you know. Understandably, Your Honor, we don't want criminal aliens here, but other countries do not want to accept back people with criminal convictions either. All right. So what is under Zovitis? The government's really what we should be looking at is whether there's been a finding of fact and whether there's a reasonable probability that Sudan or Sierra Leone would take him. And if there's not, under Zovitis, he's supposed to be released. Correct. As regards Sudan, Sudan has actually refused. I mean, that's in the record. They refused because Mr. Sesay cannot produce a birth certificate or a passport. But given his history of having fled from the country at 8 years old and being born in a village where there's no hospital, let alone anyone keeping records, he has no way of proving he's from Sudan. But that's what Sudan insisted on. So they're refusing to accept him. Sierra Leone, on the other hand, has said nothing for two and a half years. They've simply said, we're working on it. We're reviewing it. I think the government would argue or does that if he's not trying, if he's not cooperating in trying to get documents to Sierra Leone, it doesn't matter what Sierra Leone's reason for not giving him documents is. In other words, they're denying that causation has to be shown if. That's correct, Your Honor. But I think that's wrong. I think you can look at Pellish. And Pellish uses the word causes. The alien causes his honor. So he said the thing that the district court did here. He holds the keys in his own hands. Yes. Yes. And, by the way, this is the same district court judge as in Pellish. So I think he's a little bit sensitive to this issue. But the point is that it's clear. It makes no sense. It's like the materiality requirement is that there has to be a cause. As the Supreme Court said in Zadvidus, there's constitutional concerns when civil detention is used for punitive purposes. It cannot be used for punitive purposes. And so incarcerating people simply because they lie or make statements or they do something, but it has no material effect on the removal. If the removal, failure of removal, is something else, you can't incarcerate. Well, would it be your position that a court, you know, when you have a dispute as to where someone's from, and he can say he's from Sudan forever, and you can't beat that out of him whether he is or he isn't, if the court made a determination that he's from Sierra Leone and he filled out all of the rest of his papers, then? He's cooperating. Then he's cooperating. And, in fact, this isn't in our record, but this is events that happened subsequent to the filing of the appeal that I can represent to the court that Mr. Sesay now has a new deportation officer. Officer Estrada is, frankly, quite more cooperative and proactive than the previous deportation officers. He and Mr. Sesay have been cooperating and trying to find a third alternate country for him to be removed to. Mr. Sesay said in February of 2008 he would gladly go to Sierra Leone. He told Officer Pitt this. It's in his declaration. He would gladly go to Sierra Leone if they will accept him. He doesn't want to be in custody anymore. He'll go to any country. And Officer Estrada and Mr. Sesay have cooperated in trying to obtain travel permission to Canada and, most recently, to South Africa. Unfortunately, both those countries refused because he has no real connection to either country. But he's not refusing to cooperate. He simply doesn't want to lie and say I'm from Sierra Leone when he is from Sudan. That's sort of a newfound sensitivity. I mean, you know, he's gone back and forth so many times in his past. I mean, he has a pretty consistent Sierra Leone passport use. I would respectfully disagree. I believe he's been consistent quite all through his time. He was brought into the country under a false Sierra Leone passport. In order to maintain his status in this country, he did continue to state officially that he is from Sierra Leone. But as the declarations in the records show, that 20 years before the removal, he was telling people I'm from Sudan, my name is Jabar, my family was killed, and I was put into slavery and brought to the United States. We have a sworn affidavit from John Edwards who knew him 20 years ago and said he told him this 20 years ago, long before there was any reason to fabricate for the purposes of the removal, 20 years before the removal. But did he fill in the travel document? Did he complete the travel documents for Sierra Leone? Yes. Yes. Officer Pitts says he has done that twice, that he has fully cooperated. He has never refused to fill in the documents. He just won't say he's from Sierra Leone. He has to say truthfully that I'm from Sudan. But I would point out that there is actually no legal reason why being from Sudan would keep Sierra Leone from accepting him, because when you look at the destinations, the priorities of destinations in the statute, the last priority is any country that will receive the deportee, which is Congress's recognition that some countries may accept someone who is not a citizen or national if they're willing to take them, which was the purpose of applying to Canada and to South Africa. So there is a realization that a country may accept someone who is not a citizen or national. Mr. Sesay could go to Sierra Leone, but Sierra Leone continues to drag its feet, says we're working on it, it's in the mail, and the latest representation, and I just say that, again, it's not in that record, but what I understand is Sierra Leone said that they will reconsider and they will get an answer, a definitive answer back by the middle of July. It's not the beginning of August. Again, once again, it is a false promise or just dragging their feet. And it's understandable because there are repercussions. The State Department, besides injuring their relations with the United States in general by giving an outright refusal, the State Department is authorized to impose sanctions on countries that refuse to cooperate with deportation. So naturally, many countries will not say yes or no. For them, the reasonable option is to simply say nothing and do nothing, saying we're working on it, we're working on it. But two and a half years simply to verify whether this passport number with this name on this birth date issued on this year is a valid passport, the government has that. They submitted that to Sierra Leone. They submitted a copy of Mr. Sese's forged passport. Does it take 30 months to decide whether that's a real passport? That's totally unreasonable. But does this boil down to his failure to cooperate if it is or it isn't his? I'm for Sudan, that he won't. But without a showing that that is the cause for the delay, there is no showing of obstruction. The government has not sustained its burden to show there's been an obstruction. But is that the government's position, as you understand it, that that's what the basis of this obstruction is? They have never issued anything else, and they can't because their own officer Pitt has sworn that he has fully cooperated, not once but twice he has cooperated. And now we know he has also cooperated with efforts for removal to Canada and South Africa. He's not trying to stay in the United States by any means possible. He just wants to get out of custody, and he'll go to any country. He'll go to Sierra Leone. He reported that to Officer Pitt. I'll go there if they'll accept me. He just asked him, please, apply to Sudan. And it was on his insistence that ICE in the end sent a request packet to Sudan and arranged a telephone interview with the embassy. Is your strongest argument that as opposed to that the government's procedurally defaulted because of the timing of the notice? I think they're equal because they're both equally clear as a matter of law that the summary judgment should have been granted. The regulations are clear on the face that unless the notice of noncompliance is served within the removal period, the 98-day removal period, they cannot extend the ‑‑ they cannot suspend the removal. Well, but they can if they can show the person's a danger so they have other, you know, I'm not sure I'm buying your strict liability here. Well, Your Honor, I would say there's a difference between the authority to justify detention past the 90 days. They do have that. They can extend detention past the 90 days. But it's a different thing to say whether the removal period has been suspended. That's what the government's relying on, that they have not violated ad vitis because the removal period has been suspended for noncooperation. Right. And isn't the better argument for the government that Petitioner has not demonstrated his deportation is not reasonably foreseeable under ad vitis? No, I think that that's totally unsustainable, Your Honor, because look at the evidence. He's been held for five times the reasonable period established by the Supreme Court. Has that issue been determined by any ‑‑ by the court, by the district court? There was never a particular ruling because the government never, in its return, never defended on that basis. They didn't defend on the basis that he had not made his ad vitis showing. Their only defense was noncooperation. They never provided any evidence, and indeed they can't, to show that removal is reasonably foreseeable. Not after five times the period set by the Supreme Court. Not when they have gotten absolute stony silence out of Sierra Leone. And all they will say when they can reach the consulate, all the government has ever gotten was we're reviewing it. There has never been anything more definite than that. That is foot-dragging. That's intransigence. That's unreasonable. The Supreme Court said six months is a reasonable period, objectively reasonable period to get effect removal. And if that's not done in six months, there's no presumption of reasonableness. And certainly when that time has been exceeded five times over, there is no significant likelihood that Sierra Leone is going to come up with evidence. I recognize that you say he's cooperating and everything, but I suppose a person being held for deportation could game the system by saying, okay, I'm being deported to Uganda, and I'll fill out the papers, and I'll tell them I'm from Nigeria. Or I'll submit my false passport to Uganda that we know is false. I constructed it myself. And he's probably not going to be accepted by that country. Maybe they'll just drag their feet, but they're probably not going to say yes. That could be true, Your Honor, and that might be a different case if those were the facts here. The facts here are, though, 20 years before Mr. Sesay was ever in removal proceedings when he was still a teenager, he told Mr. Edwards that I am from Sudan, and my family was killed, and I was sold into slavery. He told that 20 years before there was any motive to make up such a story. And that totally undermines the government's claim of recent fabrication. They have claimed from the beginning that Mr. Sesay made this up on the day of his removal hearing, and that before that he maintained he was from Sierra Leone. Well, he did say he was from Sierra Leone because that was the only status in which he was admitted to this country. So it's true. He was telling people, I'm from Sierra Leone, when he needed some official recognition in order to stay in the country. But once he was put into removal proceedings, he said, I'm from Sudan. He's been telling the truth. He's come clean from that day. On the advice of counsel, he has entered an asylum claim. And I would say that in that regard, this case is exactly like the case of Abdel Mufti, which I cited in the briefs, where the detainee had made multiple claims of nationality before the removal period, but once he got into the removal thing, he maintained he was Palestinian, consistently claimed he was Palestinian, even though the government believed he was from Honduras. And the district court said, that's not obstruction. If he is making a good-faith, consistent argument that he has a different nationality, the district court said ICE cannot detain him until it gets answers it likes. And I think that's exactly the situation here. The Mr. Sesay has come clean at his removal hearing, and now he's in a Kafkaesque dilemma because he has told the truth. He can't be removed to Sudan because he has no documents from that country, given his history. And Sierra Leone won't accept him. The government insists he's from Sierra Leone. He can't possibly prove it, even if he lied and said, yes, I'm from Sierra Leone. How could he support that? He has no documents. He has never been there in his life. He can't even make up a story that would be credible to Sierra Leone, assuming Sierra Leone would actually respond. And, in fact, the thing that shows that that would not have any effect is the sworn testimony is that the Sierra Leone officials do not even believe the story that he's from Sudan. Officer Pitt and Officer Padilla, in their testimony, said Sierra Leone doesn't even believe he's from Sudan. So how can that possibly be a reason why they're delaying? They don't even believe it's true. So there is no sign of any refusal. There's nothing to show that there's a cause-and-effect connection between anything that Mr. Sesay's done and why there are no travel documents. But he's stuck in this dilemma. He will remain in indefinite detention because he can't be removed to Sudan, his real country, and Sierra Leone's dragging their feet and doing nothing. He's attempting as best as he can, now with the cooperation of Officer Estrada, to find another destination. But, of course, these other countries for which he has no legal connection are not necessarily going to accept him. He's stuck in detention, as far as we know, indefinitely. And that's exactly what the Supreme Court said that is not authorized under the civil detention statutes. All right. Thank you, Counsel. Thank you. May it please the Court. My name is Caroline Clark, and I represent the United States in this matter. The district court did not, or in denying Mr. Sesay's petition for writ of habeas corpus. Contrary to what Petitioner's Counsel has just alleged, the district court and the government have relied on much more than just one sentence to conclude that Mr. Sesay is not cooperating with the government's removal efforts. Well, what is his non-cooperation? His non-cooperation is a history. Is it that he says he's from Sudan? Yes, it is. Okay. It is. Well, if he's never going to change that, it doesn't seem right that people can game the system as far as that goes. But, on the other hand, the government has a right to expect people to tell the truth. All right. And if there's a determination that they're not telling the truth, is there a mechanism that the court can then determine that they're from Sierra Leone, and then it can proceed like that? I mean, he can say he's from Sudan for the rest of his life, but if he does everything, you know, what if he really is? I mean, you can't beat him into saying he's from Sierra Leone. Correct. So, I mean, we don't want a policy where these things can't proceed. But, by the same token, it's sort of like if someone goes to their death saying they're not guilty, it doesn't mean that they don't serve their jail sentence. But, on the other hand, you can't keep continuing to beat them, and you can't require them to say that they're guilty. So the fact that someone will not admit they're from where you think they are from shouldn't keep the process from going forward. And here it looks like the court did something and said, I think you're from Sierra Leone, but there was some expert or something like that. True. And it actually is the issue. So why is what he's doing stopping it? The issue before the district court was, as Mr. Sese is alleging that he is from Sudan, is he from Sudan? That is the extent to which he is cooperating. In his application for travel documents, I think it's to misconstrue what he's doing to say that he's fully cooperating with authorities. If he's filling out an application for travel documents to Sierra Leone, they submit his passport indicating he was born in Freetown, Sierra Leone, as well as his application for employment authorization, his application for temporary protected status, which he was granted from Sierra Leone. And then on his application, he says, I am from Sudan. First of all, both Pelich and Lima require causation. What I didn't see proved anywhere was that the reason Sierra Leone won't take him is because he filled out that he was from Sudan on his papers. That, I believe, is the sentence that Mr. Fife was referring to. So that's the sole support the government has for that causation. Well, and I guess the government would also veer that it's the causation. This Court's opinion in Lima found that we cannot know whether the alien's removal is even a remote possibility until the alien makes full and honest efforts to secure the travel documents. So the government is unable to go behind Sierra Leone's delay or confusion. Right. But Sierra Leone hasn't refused him. True. They just haven't done anything. So how can you say he's holding the keys to his deportation in his own hands? Right. What Mr. Sesay's actions have done is essentially complicate the process. So complicating the process is enough for indefinite detention? And the government's position is he is not indefinitely detained. And it is true that Officer Estrada is still working with the Sierra Leone consulate. I heard an expected response by the middle of this month, August, that they have been asked to try to authenticate the passport, and despite Mr. Sesay's affirmation that he is from Sudan, to try to verify that he is actually from Sierra Leone. But, okay, since, you know, there's things that sometimes they're contested. We never really know what the truth is, but we make determinations and then move forward. If he, I mean, you can't know for 100% that he's where he's from, you know. And so if he will never say he's from Sierra Leone, can you keep him forever? That just can't be right. I mean, there has to be a mechanism that, you know, if in the process where if you think someone's lying, that then you put all the evidence there, and if you make a determination, that it should then be able to continue to move forward. I mean, otherwise. Right, right. And what the statute provides is the extension of the removal period upon this finding of non-cooperation. And that's, I. Right, right. It provides for an extension of the removal period. But here the removal period ended. And before you filed for this extension. So how can you extend something that's ended? And it is true that the notice that started to comply was not issued until after the removal period had ended. It was issued after DHS received word from the Sierra Leone Consulate that they, that it was this claim to Sudanese citizenship that was delaying their willingness to issue travel documents. But you have several other people saying, including your own immigration officers, saying that that's not the reason. Reif, isn't Reif one of them? Oh, I don't believe so. There's somebody else who's saying that that's not the reason, that Sierra Leone, in the record. Well, I think Mr. Fyfe had argued that the Sierra Leone Consulate had indicated that they did not believe Mr. Sesay's claim to Sudanese citizenship. So they were not believing it either. But that doesn't go to establish that he is actually from. It doesn't help the Sierra Leone Consulate establish that he is a citizen of their country and eligible for travel. Well, they don't believe him in his statement that I'm from Sudan. They don't believe it. So how could that be the cause of why this is happening? Well, the issue before the district court was, is he, as he says, from Sudan? If he's not from Sudan, as the district court determined, where is he from? Maybe he's not from Sierra Leone, but we know he's not from Sudan and he's saying he's from Sudan. Well, we don't really – I mean, the district court found that, but that expert report is really rather internally inconsistent and non-conclusive. I would disagree. I know it's your position that you hate it. He says, well, I can't really say. It seems more likely that he's from Sierra Leone or at least not from Sudan. And that's exactly what he was asked to determine was. He's an expert in Sudanese anthropology. And what the district court was dealing with was, is Mr. Sesay being cooperative when he appears he's from Sudan? The expert, who both parties had an opportunity to locate an expert, both parties moved for this specific expert to be appointed. As the court appointed expert, he was appointed. He interviewed Mr. Sesay. He had also been informed by, as Mr. Fyfe had represented in a hearing, that Mr. Sesay understood words in Dinka, which is the language of Sudan that he claims to be from. Right. So you've believed by a hearing you've determined he's not from Sudan. Okay. So how the fact that he continues to claim he's – you've already decided he's not from Sudan. How is his continuing to say he's from Sudan delaying what's happening? Well, because he's not being truthful about where he is from, that implicitly – Well, how do we know from the record since the people from Sierra Leone say they don't think he's from Sudan? I mean, how do we know that that's the – how do we know – I mean, has Sierra Leone said the only reason we will not take him is because he says he's from Sudan? They have not. And that's the complicating factor here is that the agency, the government, has no means to communicate directly with the consulate about their reasons for issuing or not issuing or stalling or delaying. So you're saying you don't know if this is the cause or not? Well, we're – in the record, the consulate did inform DHS initially, and I can get the date, that they were not going to issue – it was in December of 07 – that they were not going to issue because of the Sudanese claim. But that seems to have changed because they don't really believe that he's from Sudan. And that was 2007. We're approaching December 2009, so that's now almost two years. And I guess – and the other way of putting that is he – you know, he's saying he's not from Sierra Leone. So you're trying to force him to say he's from Sierra Leone. No, not at all. How would – well, but if he said it, how would that help? How would – once – and this is exactly the point that Lima, the INS, addresses, because once he cooperates, if he is from Sierra Leone – But you're saying the only way he can cooperate is to now say, I'm from Sierra Leone, and then all of a sudden Sierra Leone is going to admit him. No, Your Honor, no, no, I'm not. If he were to – what we've established and what the district court agreed with is that his claim to Sudanese citizenship is not correct. If he makes a claim that he alleges is correct, for example, if he says he's from Sierra Leone – He says he's still from Sudan. You know, I mean, how can you make him say what he – you know? Right. I was going with the hypothetical about what – if he were to say that he's from Sierra Leone, how is that magically going to fix this? What it is going to do is he will then be in full compliance. If Sierra Leone still cannot issue travel documents, then we're in the Zagidas framework. Then we're looking at – So he has to say the magic words, okay, I've been lying for, what, since the removal proceedings, and I really am from Sierra Leone, and then you're going to release him? No, Your Honor. Then that information would be reported to – And they're not going to believe it. They're not going to believe it because he's been lying about – I mean – And if they don't, then he is free to bring another habeas petition under Zagidas once he has fully complied. And that's exactly what this Court said earlier. What if it's really true that he's from Sudan, okay? What if that's really true? And he's one of these people that, you know, he wants – what if he really is telling you the truth? So that's – I mean, you put forth and, you know, you put forth – You had a hearing, and that hearing came out with something to the effect of that this person isn't Sudanese. You can pass that on to Sierra Leone, right? Right. And so how is he continuing to not cooperate? I mean, what if he's really from Sudan? We'll never know that. He has failed to establish that, that he is from – he has had every opportunity to present evidence. And I actually – that leads me into addressing Mr. Fife's points about the record indicating that up to 20 years ago, he was indicating he was from Sudan, that there's evidence of that in the record. There's no evidence of that in the record. Are you troubled by this at all, though, that, you know, nothing's happening and he's just there? I mean, do you really think it's all his fault because they said – I mean, is it all his – I mean, the whole problem here is I'm from Sudan. Is that causing this whole problem? That's what's causing the finding of non-cooperation. To the extent we can get that out of the way, once he is fully cooperating and being truthful, then we get to the issue of the consulate delay. You have to admit it is Kafka, yes, because he could be being truthful. And we know his Sierra Leone passport is false, right? We do not know that. No, no, we do not. Hasn't – okay, so have you asked Sierra Leone? Yeah, and that's part of this process has been to try to authenticate. Has it been going on for two years? Well, I think there have been different officers involved and different consular officers involved in this process. It has certainly been an ongoing activity for the ICE officers. How long does it take to verify a passport? I do not know, Your Honor. I'm unfamiliar with the consular process. Well, is there any provision anywhere for an evidentiary hearing to determine where he's from? I mean, I know you've got experts and I know you've got affidavits and things like that, but there's no – To the extent we approached an evidentiary hearing in the district court below, the evidence was so overwhelming that Mr. Sessay presented nothing but for his own declaration and those of Mr. Edwards. Was that actually an evidentiary hearing? No. It got to the point of cross-motion for summary judgment and then the district court found that the evidence was overwhelming and a hearing was unnecessary. The only evidence supporting Mr. Sessay's affirmance were his own declaration saying that he's now from Sudan. He's previously sworn under oath that he's from Sierra Leone and he's also made statements about U.S. citizenship. Is it true that he's applied to Canada and he's applied to some other country as well? I have not heard that he applied to Canada. I was informed by the ICE deportation officer that they made an application to South Africa, which was denied because they found – because there was no evidence he was from South Africa. And Sudan is actually denied, too, right? Correct. Correct. Yes, that's correct. What if – I mean, it seems as though there's no reasonable probability that anybody's going to take him. Well, again, we get back to – I do know that Sierra Leone – they are still in contact with the Sierra Leone consulate. I realize that it's taken longer, certainly, than anyone hoped for or expected. But there is still an expectation or a hopefulness that the travel documents will be issued from Sierra Leone. By the way, I know from other cases that DHS has its own people or its own department who can determine whether documents are authentic or not. Right, correct. Have you submitted that passport to our own government's people? I don't believe the passport's been submitted. The government is not of the opinion that it's a fraudulent document. It's not of the opinion? Correct. So why don't you have it verified one way or the other by the U.S. government? That's a good suggestion. I just – I don't think it's been done at this point. I do know it's been referred to the Sierra Leone authorities to have them verify, but certainly there's been no – Our own State Department can do that. True, true. Well, you're over time, but I'll give you a little bit more time because I gave CSA's counsel a little bit more time. Okay, thank you. Thank you, Your Honor. And I do, again, want to emphasize that I think that this – the posture of this case is extremely similar to that in Lima, and that we don't get to the issue of an interminable delay in issuing a travel document until we've verified that or until there is some evidence that Mr. Sesay is cooperating with the removal efforts. And to the extent that the notice of failure to cooperate was issued untimely, certainly the statute and regulations do not provide any sort of a waiver for if someone is found to not be cooperating after the removal period, after the 90 days, that then they should be released. But the language of the statute is mandatory that it shall be filed. The notice of cooperation shall be filed within the 90-day period. True, it does say that. There is also the regulation that provides that failure to file within that 90 days does not allow the alien to essentially escape that provision. So he is not able to waive out of that statutory right. Where is he being held in detention? He is at CCA in Otemesa, California. How long has he been held now? I'm sorry? How long has he been held now? He entered DHS custody in October of 2006. He was ordered removed by an immigration judge after his application for asylum from Sudan was denied in May of 2007. So that would be when the removal period started. He waived appeal of the immigration judge's finding. And on the day after his removal order, DHS first requested travel documents from Sierra Leone. I mean, it wasn't until December that DHS received information that it was the Sudanese claim of citizenship that was delaying their issuance of travel documents. I don't think we have any further questions. Okay. Thank you. All right. Thank you very much. Okay. We will submit. I did try to reserve two minutes. I know I used up all my time. You used seven more. You got seven more. Is there a case you want to cite to us, or what is it? One case and just three very brief points. Okay. All right. I did want to point out in Pellich that Pellich does say in footnote 3 that it would be a different case if INS tries to force him to include information he maintains as false. It's not just Mr. Thomas' statement, Officer Thomas' statement. That is all the government has relied on, but that is contradicted by the sworn testimony of four different declarations. Mr. Sesay has not had every opportunity to present his case. He was denied an evidentiary hearing. That is our fourth claim, that there should have been an evidentiary hearing. And in support of that, I would cite a case this Court decided yesterday, Owino v. Napolitano, where it held that when there is a question of affidavit credibility, an evidentiary hearing is required under Blackledge v. Allison, the Supreme Court case, and citing that case. So this Court has already decided that in habeas cases like this, that was his advidas case, that when the government offers an affidavit and there's some question of credibility, an evidentiary hearing is required except in the rarest instances. And that's what did not happen here. I don't have any other questions. So I'll just close the case. You said what? Owino v. Napolitano. Owino. Why don't you write it down and give us the site or the westlaw number and hand it to the clerk after the argument? Yes, My Honor. If you prefer, I could do a 28-J letter, if that would be. Just hand it to us today. Thank you. He's just decided yesterday. And that's proposing counseling. Right. Certainly. All right. Thank you. We'll submit the case now, and the session of the Court is adjourned for today. Okay.
judges: Canby, Wardlaw, Callahan